Argued March 4, affirmed May 31, 1968

# STATE OF OREGON, *Respondent, v.*
# JAMES E. TRAVIS, *Appellant.*

441 P. 2d 597

*Bill R. Vertrees,* Salem, argued the cause and filed a brief for appellant.

*John L. Snyder,* Deputy District Attorney, Dallas, argued the cause and filed a brief for respondent.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

GOODWIN, J.

The defendant appeals a conviction of burglary (ORS 164.230). The indictment charged the breaking of a house and an assault upon a female occupant. The only issue upon appeal is whether the trial court should have excluded incriminating admissions made by the defendant to an investigating officer.

The complaining witness had reported to the police that the defendant, with whom she was acquainted, had broken into her house at night while her husband was away and that she had awakened to find the defendant on her bed. A police officer called at the defendant's home for the purpose of checking on the complaint. The defendant and his wife were both at home, and the defendant invited the officer inside. The officer declined the invitation, suggesting instead that it might be better if they talked in the officer's car.

■ After the officer and the defendant were seated in the police car, the officer said, "this is a criminal matter," and advised the defendant "that he had an absolute right to an attorney before making a statement." The officer did not, however, advise the defendant of his right to counsel at public expense and of his absolute right to remain silent if he wished to do so. Accordingly, the advice fell short of the advice required under our decisions in cases of custodial interrogation. See *State v. Edwards,* 244 Or 317, 417 P2d 766 (1966); *State v. Keller,* 240 Or 442, 402 P2d 521 (1965).

When the officer told the defendant about the woman's complaint, the defendant promptly admitted his presence in her home. The officer then told the defendant that the police would "contact him later" if a warrant should be issued for his arrest. The officer took his leave and the defendant returned to his house. The next day, the defendant was arrested and charged with burglary.

On the foregoing facts, the trial court found that the defendant had not been under arrest or "otherwise deprived of his freedom of action in any significant way," within the meaning of *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d

974 (1966). Defendant's statements to the officer were received in evidence.

Prior to the *Miranda* decision, this court had permitted the police to testify to conversations with focal suspects who had been questioned while not under arrest even though the officers had not first advised them of their rights. See *State v. Evans,* 241 Or 567, 573, 407 P2d 621 (1965). Since the trial court deemed *State v. Evans* controlling, this appeal seeks to have that decision overruled.

■ This court was not unanimous in the *Evans* case, and the defendant now argues that the *Miranda* case has made the *Evans* case obsolete even if *Evans* correctly stated Oregon law at the time it was published.

The defendant argues that the exclusionary rule now must be applied whenever a focal suspect is interviewed or interrogated without being advised of his rights. He would have us exclude the evidence regardless of the degree of police control or custody being exercised over the suspect at the time of the interview. By focal suspect, the defendant presumably means one whom the police have probable cause to arrest; this is the meaning we give to the term.

■ Though the facts of the *Miranda* case involved police-station interrogation, the reasoning in that decision applies to custodial questioning outside the police station. It is clear that the police may not avoid the *Miranda* rules by questioning an arrested suspect on the way to the police station or in the field. See *State v. Keller,* 240 Or at 448. And see Graham, *What Is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona,* 14 UCLA L Rev 59, 83 (1966). It is not always clear, however, at what point field questioning of a suspect becomes

custodial interrogation. See, e.g., *State v. Taylor,* 249 Or 268, 437 P2d 853 (1968).

■ The badge of a police officer representing governmental authority, in and of itself, may have a subtly coercive effect. But we cannot believe that any psychological pressure emanating from an officer's authority is likely to cause an innocent person, who knows that he is free to come and go, to confess a crime he did not commit. Nor is a question by an officer likely to produce involuntary self-incrimination on the part of a guilty person if that person is not under arrest or under any other form of restraint.

■ The basis of the exclusionary rule is the Fifth Amendment guarantee against compulsion. The *Miranda* case held that police custody is "inherently coercive." If, in fact, there is no custody, there is no danger that a coercive environment will be created. There is no need, therefore, to indulge in a fictitious assumption that we are preventing coercion when we exclude otherwise admissible evidence.

Some post-*Miranda* cases have held that field interrogation of suspects requires all the *Miranda* warnings if police have probable cause to believe the suspect is guilty. See, e.g., *People v. Terrell,* 53 Misc2d 32, 277 NYS2d 926, 939 (Sup Ct 1967) ; *Commonwealth v. Jefferson,* 423 Pa 541, 226 A2d 765 (1967). On the other hand, the New York Court of Appeals has held that answers produced by field interrogation of a focal suspect without the *Miranda* warnings could be received in evidence where the suspect was not yet under arrest and the coercive elements described in *Miranda* were not present. *People v. P.,* 21 NY2d 1, 233 NE2d 255, 286 NYS2d 225 (1968). See, to like effect, *Evans v. United States,* 377 F2d 535 (5th Cir 1967) ; *United States v. Agy,* 374 F2d 94 (6th Cir 1967) ; *United*

*States v. Schlinsky,* 261 F Supp 265 (D Mass 1966); *United States v. Davis,* 259 F Supp 496 (D Mass 1966); *State v. Noriega,* 6 Ariz App 428, 433 P2d 281 (1967); *People v. Allen,* 28 App Div2d 724, 281 NYS2d 602 (1967).

In *State v. Taylor,* supra, it was held that incriminating statements could be received, even though the suspect had not been advised of his rights. In that case, the officer was making a preliminary inquiry at the scene of an automobile accident to determine whether or not a crime had been committed. If the suspect had been given the appropriate advice before any questions were asked, the difficulty in that case could have been avoided; but we held that there was no error in receiving the evidence.

■ In the case at bar, the trial court found that the suspect was in fact free of restraint at all times and left the scene of the interrogation as a free man. He was not arrested until substantially later. There is no reason, therefore, to overturn the trial court's finding that the defendant was not, in fact, in custody when he was being interviewed.

Affirmed.

O'CONNELL, J., dissenting.

The majority opinion is based upon the assumption that the police are restricted in interrogating a person suspected of committing a crime only if the questioning takes place in a "coercive environment." This statement of the accused's constitutional rights is too restrictive. I believe that the majority falls into this error as a result of reading *Miranda* too narrowly.

*Miranda* and *Escobedo* are bottomed upon the "basic rights that are enshrined in our Constitution— that 'No person * * * shall be compelled in any

criminal case to be a witness against himself' and that 'the accused shall * * * have the Assistance of Counsel'."[1]

It is true that in describing these constitutional rights *Miranda* relates them to one who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" (384 US at 444)—circumstances which normally create a "coercive environment." But if we accept the premise stated in *Miranda* that the privilege against self-incrimination and the right to counsel are the constitutional rights involved in the police interrogation cases, then it is not necessary to establish the coercive character of the interrogation setting because these constitutional rights are recognized where coercion, actual or potential, is not relevant. Thus the accused is entitled to the right of counsel and the privilege against self-incrimination at the trial stage where the setting is clearly not coercive in the sense that the term is used in the majority opinion.

The majority's confusion, which is shared by other courts, stems from the failure to see that the Fifth Amendment privilege is more than a protection and prophylaxis against coercive practices and rests upon a broader base relating to notions of fair play designed to preserve the privacy of individuals and the integrity of our system of the administration of justice when the state prosecutes one of its citizens. This broad scope of the privilege has been recognized by others, including members of the United States Supreme Court. Thus, in *United States v. Wade*, 388

---

[1] Miranda v. Arizona, 384 US 436, 442, 86 S Ct 1602, 16 L ed2d 694, 705, 10 ALR3d 974 (1966); Escobedo v. Illinois, 378 US 478, 84 S Ct 1758, 12 L ed2d 977 (1964).

US 218 at 261, 87 S Ct 1926, 18 L ed2d 1149 at 1176-77 (1966), Mr. Justice Fortas said:

"This great privilege is not merely a shield for the accused. It is also a prescription of technique designed to guide the State's investigation. History teaches us that self-accusation is an unreliable instrument of detection, apt to inculpate the innocent-but-weak and to enable the guilty to escape. But this is not the end of the story. The privilege historically goes to the roots of democratic and religious principle. It prevents the debasement of the citizen which would result from compelling him to 'accuse' himself before the power of the state. The roots of the privilege are deeper than the rack and screw used to extort confessions. They go to the nature of a free man and to his relationship to the state."

Similarly, in *Murphy v. Waterfront Commission of New York,* 378 US 52, 55, 84 S Ct 1594, 12 L ed2d 678, 681 (1964), Mr. Justice Goldberg sees the privilege as reflecting, among other values:

"* * * [O]ur sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev, 1961), 317; our respect for the inviolability of the human personalty and of the right of each individual 'to a private enclave where he may lead a private life,' United States v. Gruewald, 233 F2d 556, 581-582 (Frank, J., dissenting), revd 353 US 391, 1 L ed2d 931, 77 S Ct 963 * * *."

John T. McNaughton, in an article entitled *The Privilege Against Self-Incrimination: Its Constitutional Affectation, Raison d'Etre and Miscellaneous*

*Implications,* published in Police Power and Individual Freedom, 223 at 235 (Sowle ed 1962), illuminates his statement quoted in *Murphy v. Waterfront Commission of New York, supra,* with the following:

"There is a strong policy in favor of government's leaving people alone, and there is a complementary strong policy which demands that any contest between government and governed be a 'fair' one. It follows that the government should not disturb the peace of an individual by way of compulsory appearances and compulsory disclosures which may lead to his conviction unless sufficient evidence exists to establish probable cause. Obviously, if the individual's peace is to be preserved, the government must obtain its prima facie case from sources other than the individual. According to Dean Wigmore, there was a moment in the early 1600s when the privilege, in its primordial state, was assumed to go no further than this; it was not doubted that a suspect could be made to respond to questions once he was properly accused; it was just that a person could not be compelled to provide the *first* evidence against himself.

"The principle was not long so limited, in any event.

"In the 1641 flood, which ostensibly was aimed at the fishing expedition and which therefore swept away the Courts of Star Chamber and High Commission and of course the hated oath ex officio, the ground was washed from under all compulsory self-incrimination. Since 1680 it has been assumed that, even though probable cause has been established (and the peace of the individual may be disturbed to the extent that he is required to stand trial), nevertheless the government cannot compel self-incriminatory disclosures.

"That not only the oath ex officio but all authority to compel self-incriminatory disclosures was extinguished in the final decades of the 17th cen-

tury may be attributable to the revolution in political thought which was occurring at the time. The sovereign king was being supplanted by the sovereign individual. This philosophy, dominant now for three centuries, naturally nurtures the concept that the individual may not be conscripted to assist his adversary, the government, in doing him in. It would not be a 'fair fight.' "[2]

The Supreme Court has at times emphasized the importance of the privilege in the preservation of our system of criminal justice. For example, in *Tehan v. United States ex rel. Shott*, 382 US 406, 415-416, 86 S Ct 459, 15 L ed2d 453, 459 (1966), Mr. Justice Stewart explained that "the basic purposes that lie behind the privilege against self-incrimination do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.' "[3]

---

[2] See also at p. 237, where McNaughton sees two "significant purposes" of the privilege:

"* * * [1] The first is to remove the right to an answer in the hard cores of instances where compulsion might lead to inhumanity, the principal inhumanity being abusive tactics by a zealous questioner. [2] The second is to comply with the prevailing ethic that the individual is sovereign and that proper rules of battle between government and individual require that the individual not be bothered for less than good reason and not be conscripted by his opponent to defeat himself."

[3] See also Ullmann v. United States, 350 US 422, 427, 76 S Ct 497, 100 L ed 511, 518-519, 53 ALR2d 1008, 1015 (1955), quoting from Maffie v. United States, 209 F2d 225, 227 (1st Cir 1954):

" 'Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten today. See VIII Wigmore on Evidence (3d ed 1940) § 2250 et seq.; Morgan, The Privilege Against Self-Incrimination, 34 Minn L Rev 1 (1949). They made a judgment, and expressed it in our fundamental law, that it were better for an occasional crime to go unpun-

In other cases the role of the privilege in safeguarding the individual's right has been emphasized. In *Sinclair v. United States,* 279 US 263, 292, 49 S Ct 268, 73 L ed 692 (1928), Mr. Justice Butler saw the privilege as reflecting the policy that the individual be left alone. He said:

"* * * [F]ew if any of the rights of the people guarded by fundamental law are of greater importance to their happiness and safety than the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect to their personal and private affairs."

Professor McKay has recently observed that these concerns for the integrity of the system and the protection of the individual are complementary. He states:

"In sum, from all the welter of reasons given in justification of the privilege against self-incrimination, it seems to me that only two have any great probative force, and they are perhaps opposite sides of the same coin: (1) preservation of official morality, and (2) preservation of individual privacy." McKay, *Self-Incrimination and the New Privacy,* 1967 Sup Ct Rev 192, 213-214.

It is reasonable to conclude, then, that since coercion or the probability of coercive practices is not an essential ingredient of the privilege against self-incrimination, it is not necessary for one who claims the protection of the privilege to show that he was questioned in a "coercive environment." It is enough for him to show that he was accused or suspected of committing a crime and was questioned for the purpose of obtaining evidence of the crime. This, I take it, was what the court in *Escobedo* meant in holding "that

ished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused. * :* .*' "

when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate" and at that point the person who is the focus of inquiry is entitled to the constitutional safeguards. (378 US at 492, 12 L ed2d at 987).

In *Miranda* the "focus" of investigation described in *Escobedo* is equated with the point at which law enforcement officers question a person who "has been taken into custody or otherwise deprived of his freedom of action in any significant way."[4] I submit that by so treating the deprivation of one's "freedom of action" as the crucial point in the investigatory process when constitutional guarantees become operative the court was not attempting to describe a "coercive environment," but rather was describing the stage in a criminal proceeding when it is no longer "fair play" for the state to call upon a man to convict himself out of his own mouth without full knowledge of his rights.[5] The accused unquestionably has these rights at the trial stage. He should also have these rights at any point in the pre-trial stage when he is questioned as one who is the focus of a criminal investigation.

In *Escobedo* the court recognized the rights of the accused at the stage of pre-trial interrogation, not simply because there is danger of coercive police practices, but because at that stage the accused needs the same safeguards in the protection of his constitutional rights as those which he is given at trial. Here again

[4] Miranda v. Arizona, 384 US 436, 444, 86 S Ct 1602, 16 L ed2d 694, 706, 10 ALR3d 974 (1966). In footnote 4 of *Miranda* the court states that "This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused."

[5] If this construction cannot be placed on *Miranda,* I would suggest that the latter case be reconciled with *Escobedo* in the manner I have described.

the court frames the constitutional doctrine in terms of the preservation of official morality and privacy:

> "We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Escobedo v. Illinois,* 378 US 478, 490, 84 S Ct 1758, 12 L ed2d 977, 985-86 (1964).

*Escobedo* pronounces the doctrine that a person is entitled to the protection afforded by the privilege against self-incrimination and the right to counsel "when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession." (378 US at 492). It may be difficult in some cases to draw the line between the "investigatory" and "accusatory" process, but the difficulty is no more acute than it is in applying most constitutional doctrine.

No difficulty is encountered in drawing the line in the present case. The investigation had sharply "focused" upon the accused. At the time defendant was interrogated the police had sufficient information concerning defendant's connection with the crime to constitute probable cause justifying an arrest.

It is my view that when there is probable cause for arrest questioning must cease and if an arrest is made the accused should be brought before a magistrate without delay (as required by ORS 133.550) and with-

out police interrogation before doing so.[6] There the accused would be informed of his constitutional rights in a setting free from the danger of police coercion. Moreover, it would eliminate the frequently recurring question as to whether the police in fact advised the accused of his rights.

It seems to me that the need for judicial surveillance prior to police action is as necessary where the proposal is to *interrogate* for the purposes of obtaining evidence of the crime as it is where the proposal is to *search* for evidence. In the latter case the police must subject their proposed action to judicial scrutiny by seeking a warrant unless there is some exigency justifying a warrantless search.

Another parallel may be noted. When defendant enters a plea of guilty at trial we insist that he be thoroughly informed of the consequence of his action either by the advice of counsel or through the judge who takes his plea. It seems to me that it is equally important to provide the accused with this kind of protection before he makes his "plea" of guilty to the police. As pointed out in *Escobedo,* without these safeguards "for all practical purposes, the conviction is already assured by pre-trial examination."[7]

But even if we do not go so far as I have suggested in protecting the accused, certainly we should insist that when the police have probable cause to arrest the accused he should be informed of his privilege against self-incrimination and his right to counsel before inter-

---

[6] Cf., State v. Shipley, 232 Or 354, 364, 375 P2d 237 (1962) (dissenting opinion). See also State v. Freeman, 232 Or 267, 283, 374 P2d 453 (1962) (specially concurring opinion).

[7] Escobedo v. Illinois, 378 US 478, 487, 84 S Ct 1758, 12 L ed2d 977, 984 (1964), quoting from In re Groban, 352 US 330, 344, 1 L ed2d 376, 387, 77 S Ct 510 (Black, J., dissenting).

rogation. whether or not he is in a "coercive environment."

Whether a person suspected of the crime but who is not subject to arrest for want of probable cause can be said to be a focal suspect deserving of the same protection is a question we need not now decide.

Defendant was entitled to be informed of his rights prior to interrogation. Therefore, I would reverse and remand for a new trial.

SLOAN, J., joins in this opinion.