Argued March 28, affirmed April 21, petition for rehearing
denied May 16, petition for review
denied August 1, 1972

# STATE OF OREGON, *Respondent, v.*
# DANIEL MAURICE SELL, *Appellant.*

496 P2d 44

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*John W. Osburn,* Solicitor General, Salem, argued the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

FORT, J.

The defendant was convicted, after waiver of trial by jury, of the crime of receiving and concealing stolen property. ORS 165.045. He appeals, asserting as sole error the denial of his motion to suppress certain evidence seized from his automobile.

On September 23, 1971, at about 10 a.m., Of-

ficer Kirby Amthor of the Winnemucca, Nevada, Police Department received information from Mr. Glenn Couch, owner of Glenn's Camera Shop, that three "unkempt" boys who were strangers in the town had just been in his store trying to sell some coins. The population of Winnemucca, Nevada, is about 4,500. Officer Amthor soon observed from his patrol vehicle the defendant and two other "unkempt boys," Michael Pizan and Lance Leavitt, walking down the street in the vicinity of the camera shop. Officer Amthor stated that they were the only three boys he had seen together that were strangers in the town. Then, after picking up another police officer, Wayne Michaelson, and driving around the block, Officer Amthor observed the three boys in a 1958 Ford bearing an Oregon license plate.

Officers Amthor and Michaelson followed the boys. The car proceeded through a green light and, in a 25 mile per hour zone, it was clocked at 30 miles per hour. Officer Amthor testified that he then "stopped them for speeding, doing 30 in a 25, plus three young youths trying to sell some coins in the City of Winnemucca."

Both officers were in police uniform and the vehicle in which they were riding was unmarked with a red spotlight on it. After stopping the 1958 Ford, Officer Michaelson walked to the right side of the car and Officer Amthor walked to the driver's side. The officers observed many clothes and numerous other items in the back seat of the car. Officer Amthor testified on direct examination that the following ensued:

"A  I got out of the police unit and Mr. Michaelson walked over on the right side. I got up

to the driver which was Mr. Sell and asked him for his driver's license.

"Q [by Mr. Ward] Was he in or out of the car at this time?

"A He was getting out of the car then and he gave me his driver's license and I asked him for the registration on the automobile which he did give me and I walked around back and looked in through the window of the car I saw this red electric guitar and then I asked him if he minded opening up the trunk of his automobile, which he did.

"Q And what conversation took place when you asked him if he would mind opening the trunk?

"A First he said something to the effect that he didn't know if he had the key, but then he looked, he went and got a bunch of keys and he tried one or two keys and about the third key, it hit and he opened up the trunk.

"Q Did he make any objection to opening up the trunk?

"A No, sir, not to my knowledge.

"Q Did you threaten him in any way to coerce him into opening up the trunk?

"A No, sir, I didn't.

"Q When Mr. Sell opened the trunk, what occurred next?

"A When he opened the trunk up, there was a sleeping bag, a green sleeping bag, I picked it up and there were four rifles laying there and I asked Mr. Sell whose these rifles were and he said three of them was his and the fourth one belonged to Mr. Leavitt.

"Q And then what occurred next?

"A I just asked Mr. Leavitt if this was his rifle and he said it was and I asked him what kind it was and he said he didn't know and that is when I placed them under arrest and advised them of their rights."

The testimony of Officer Michaelson is consistent with that of Officer Amthor. No search warrant was ever obtained for the search of defendant's car.

After the three boys were arrested and advised of their rights, the three were then taken to the Winnemucca police station. The rifles were taken to the police station in the officers' patrol vehicle and the Sell car was impounded. The car, as was required by the police department practice, was thereafter inventoried, as Officer Amthor testified.

"A  For their protection and our protection.

"* * * * *

"A  That is for protecting the property they have in the automobile, plus our protection. We know what is in the car in case anything they claim is missing."

Upon inventorying the Sell car, Officer Amthor

"* * * found about fourteen boxes of 30-30 shells, an electric clock, Polaroid camera, Instamatic camera, and 226 shares of common stock of Pacific Light and Power Company with the name of Upchurch, Lakeview, Oregon, on it.

"* * * * *

"A  And also in this automobile there was a pint of whiskey, Old Crow, that was there by the shells so we filed on these three minors this possession of whiskey or alcohol."

Upon finding the stock certificates, Chief Riblett of the Lakeview, Oregon, Police Department was contacted. His investigation showed that the Upchurch home in Lakeview had been broken into and that numerous items found in the defendant's car had come from the house.

The defendant was subsequently charged with receiving and concealing stolen property. He was also cited for minor in possession and for a speeding violation.

After a hearing on October 14, 1971, on defendant's motion to suppress, the court concluded that both the search of the car and its subsequent inventorying were validly conducted and specifically found:

"* * * the defendant as the owner of the automobile actually opened the trunk voluntarily and without duress upon request of the officer and by so doing legally consented to the inspection and search of said trunk and its contents."

The state here asserts that "the search of the trunk is not claimed to be incident to the stop and detention itself, but upon a consent to search."

The Supreme Court of the United States has held that searches and seizures conducted without search warrants "are *per se* unreasonable," subject to "a few specifically established and well-delineated exceptions," and that the application of these exceptions is dependent upon the presence of "exigent circumstances." *Coolidge v. New Hampshire,* 403 US 443, 454, 474, 478-83, 91 S Ct 2022, 29 L Ed 2d 564, 576, 588, 590-92 (1971). One of these "exceptions" is that of so-called "consent searches." *State v. Douglas,* 260 Or 60, 67-68, 488 P2d 1366 (1971). When, as in this case, the state relies upon a "consent search" as the basis of a search and seizure without a warrant, the question whether valid consent was given to the search is generally held to be a question of fact and the state has the burden to prove by clear and convincing evidence that such consent was given. *State v. Douglas,* supra at 68.

In *State v. Douglas,* supra, the Oregon Supreme Court stated:

"This court, in *State v. Marshall,* 234 Or 183, 380 P2d 799 (1963), agreed with this view. We held, however (at pp 184-185), that in such a case the trial court and jury is entitled to believe the officers and to disbelieve the defendant and that the question is then whether, if they believed the officers, the evidence would establish the giving of consent 'in unequivocal language and without coercion or other conduct negativing real assent to the search.'

"Later, in *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), we affirmed findings by a trial court that admissions made to the police by petitioner were not 'coerced' and held (at p 487) that if the evidence sustains such findings of fact they will not be disturbed by this court unless the facts upon which such findings are made are 'insufficient to meet constitutional standards of due process.' " 260 Or at 68-69.

We conclude from the evidence that the trial court's finding that defendant "opened the trunk voluntarily and without duress upon request of the officer" is supported by the evidence, and we thus decline to disturb that finding. *See, State v. Hinsvark,* 3 Or App 195, 471 P2d 859, Sup Ct *review denied* (1970).

The defendant, nevertheless, would have us hold that this case is governed by *State v. Williams,* 248 Or 85, 432 P2d 679 (1967), where the Oregon Supreme Court held that

"* * * The principle announced in *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964), as interpreted by us in *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965), is applicable not only to interrogations leading up to

confessions but is equally applicable to interrogation aimed at obtaining the defendant's consent to search and seizure when he is a focal suspect in the custody of the police. In effect, the request to search is a request that defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment. *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 LEd2d 694, 10 ALR3d 974 (1966), made it clear that pre-interrogation warning by the police was necessary to safeguard this Fifth Amendment privilege. In this respect *Miranda* did not add anything to *Escobedo* or *Neely* because the protection of the Fifth Amendment was implicitly the rationale of these earlier holdings. There is, therefore, no problem of the retroactive application of *Miranda.* The Fifth Amendment privilege is recognized in these cases because its application was deemed necessary as a prophylaxis against coercive police practices. The same prophylaxis is necessary whether the interrogation is used to obtain a confession or to establish a suspect's guilt through his disclosure of evidence pointing to his guilt. In the present case defendant was clearly a focal suspect and he was in the custody of the police. This is the very type of situation in which the prophylactic rule in *Miranda* was intended to apply." 248 Or at 93-94.

*See,* Note, *Consent Searches: A Reappraisal After Miranda v. Arizona,* 67 Colum L Rev 130 (1967) ; Annotation, 9 ALR3d 858 (1966).

The court in *State v. Taylor,* 249 Or 268, 271, 437 P2d 853 (1968), discusses the rationale of the cases relied upon in *Williams*:

"* * * The thrust of * * * [these cases] is the danger of *compulsory* self-incrimination that arises out of the psychological effect of the custodial atmosphere which tends to overpower the mental resistance of a suspect or an accused when

questioned. *Miranda* states 'that without proper safeguards the process of *in-custody* interrogation of persons suspected or accused of crime *contains inherently compelling pressures* which work to undermine the individual's will to resist and *to compel him to speak where he would not otherwise do so freely.*' (Emphasis supplied.) 384 US 436, 467."

In *Taylor,* the court held admissible the testimony of a police officer who testified to a conversation between himself and defendant at the scene of a traffic accident which the officer was investigating. The court stated:

"There is nothing in any of these decisions that denies the police the right in on-the-scene investigations to interview any person not in custody and not subject to coercion in any form for the purpose of determining whether a crime has been committed and who committed it.

" '* * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' *Miranda v. Arizona,* supra, 384 US 436, 477-478." 249 Or at 271-72.

In order to hold as defendant would have us, it is necessary to conclude that prior to the search of the trunk, the defendant was a "focal suspect in the custody of the police." *State v. Williams,* supra, 248 Or at 93.

"The thrust of *Miranda, Neely,* and *Williams* is that 'custodial interrogation' of a defendant who has been arrested and is then being interrogated 'contains inherently compelling pressures which

work to undermine the individual's will to resist.' [Citations omitted.] Because of the 'inherently compelling pressures' in 'custodial interrogation' of an arrested person, and as a 'prophylactic measure' to discourage 'third degree' practices by police during such 'custodial interrogations,' courts in these cases have required the state to prove not only that the defendants knew of their constitutional rights but that they were expressly informed in clear and unambiguous terms of their right to remain silent, to advice of counsel, and to refuse to consent to search or seizure of their property." *State v. Douglas,* supra, 260 Or at 70-71.

In *Douglas,* the defendant was suspected by police of having committed a recent burglary. The police asked to question him and he permitted them to enter his motel room. Once inside, the police observed a muddy coat which was believed to have been used by defendant during the burglary. The police then, without informing defendant of his rights, asked permission to examine the contents of his suitcase. Initially he refused. However, after prompting by police and his brother-in-law, who told him that the police had obtained a search warrant, the defendant finally dumped out the contents of his suitcase on the motel floor for police to examine. Incriminating evidence was found. Before trial, defendant sought a motion to suppress on the ground that the search was prior to his having been informed of his rights and thus his consent had been, in effect, illegally coerced. The Oregon Supreme Court upheld the trial court's denial of defendant's motion to suppress, stating that:

"This is a different question from that presented in *State v. Williams,* 248 Or 85, 432 P2d 679 (1967). In that case defendant consented to a search after arrest and during interrogation at the police station. Under those circumstances, we held that the

police had a duty to affirmatively inform defendant of his Fourth Amendment rights * * *.

"* * * * *

"Both the Supreme Court of the United States and this court have made it clear, however, that these 'prophylactic' rules and requirements for application during the 'custodial interrogation' are 'not intended to hamper the traditional function of police officers in investigating crime,' including the interrogation of suspicious persons in their homes, in the presence of friends or relatives, and before the process has shifted from investigatory to accusatory. * * *" *State v. Douglas,* supra, 260 Or at 69-71.

*See,* Annotation, 31 ALR3d 565, 571 (1970); Annotation, 9 ALR3d 858 (1966).

■ The foregoing serves to emphasize that the requirement that defendant be specifically informed of his rights before consenting to a search exists only when he is a "focal suspect in the custody of police." *State v. Williams,* supra, 248 Or at 93. *See,* 31 ALR3d, supra at 597-606.

In 67 Colum L Rev, supra at 137-138, it is stated:

"Under *Miranda,* two elements establish the existence of unlawful compulsion: the individual's ignorance of his fifth amendment rights, and the overbearing pressures of interrogation by the state. The first is presumed to exist in all circumstances. The second, though assumed to be present in custodial interrogation conducted at the stationhouse or after formal arrest, does not necessarily inhere in all types of police inquiry. The *Miranda* decision itself recognized that in the case of 'general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process,' the 'compelling atmosphere inherent in the process of in-custody interrogation

is not necessarily present'; in the absence of actual coercion, the police do not violate the fifth amendment by asking questions in such circumstances without warning the subject of his rights—including his right to remain silent. The individual's ignorance of his rights bars interrogation only where knowledge would aid in resisting pressure imposed by the state.

"Under this interpretation, *Miranda* requires a warning of constitutional rights before consent to search is obtained only if the circumstances surrounding the police request contain the same element of 'informal compulsion' which is present in custodial interrogation. The Supreme Court presumes the existence of coercion whenever the individual being questioned has been 'deprived of his freedom of action.' Applied without restriction, this rule might encompass every encounter with the police, for all such encounters involve an official presence which may carry with it an element of restraint—particularly when the confrontation has been initiated by the police. It is clear that *Miranda* meant to reach only instances of substantial restriction of movement. The qualifying phrase 'in any significant way' is used at one point in the opinion, although it is omitted in later statements of the test. Moreover the Court excluded investigation in the field from the scope of its holding; hence it contemplated a restraint more substantial than that which inheres in such face-to-face encounters with police officers.

"In the context of the consent search, the mere presence of the police at the subject's door may not be considered a significant restraint under *Miranda*. The factors which the Court cited as establishing the particularly compelling nature of custodial interrogation—the unfamiliar and hostile atmosphere of the police station, the secrecy of the interrogation, and the lack of communication with friends in the outside world—do not characterize the usual police request to search. Indeed, the Court specific-

ally contrasted the unfriendly surroundings of the stationhouse with the safety of the home or office."

In the case at bar, it will be recalled that the search of defendant's car trunk occurred before the officers had any confirmed reports that the crime of burglary had, in fact, been committed. Officer Amthor's testimony indicates that prior to the search of the trunk he was, because of the coin episode, suspicious of defendant and his two companions. However, it clearly does not suggest that when he consented to the search the defendant was a "focal suspect," which in *State v. Travis,* 250 Or 213, 216, 441 P2d 597 (1968), was defined as "one whom the police have probable cause to arrest."[1] Moreover, when the defendant's car was stopped by police, the evidence indicates that the former immediately left his car, walked up to the approaching Officer Amthor and responded to the officer's request for identification. Prior to his giving of consent, the defendant was not taken to the police station, told to sit in the patrol vehicle or otherwise confined to a hostile or intimidating environment. As Officer Michaelson was seeking the identification of

---

[1] Assuming that the *Travis* (State v. Travis, 250 Or 213, 441 P2d 597 (1968)), definition of a "focal suspect" is applicable to the "focal suspect" requirement in State v. Williams, 248 Or 85, 432 P2d 679 (1967), we would point out that this does not make superfluous the prophylactic requirement set forth in State v. Williams, supra. The search-incident-to-an-arrest rule generally will suffice to legitimize the warrantless search of a person or the area within his immediate control. Even in those cases what is "incident" to an arrest may vary with the circumstances. State v. Somfleth, 8 Or App 171, 492 P2d 808 (1972); Chimel v. California, 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969); State v. Elk, 249 Or 614, 439 P2d 1011 (1968). A valid "consent search," properly preceded by a Williams-type warning, legitimately allows the police to search without a warrant a "focal suspect's" person or property in instances where the search-incident-to-an-arrest rule might not suffice to permit such a search.

the two other boys, the defendant, before consenting to the search, spoke solely with Officer Amthor. This setting was no more coercive in character than is *any* encounter with a policeman, and we do not believe it was of the type in which *Miranda* and *Williams* contemplated a warning was necessary. It follows, in our view, that before the consent and search of the car trunk, the defendant was not a "focal suspect in the custody of the police." *State v. Williams,* supra, 248 Or at 93.

Contrary to defendant's contention, we do not believe that it is here material whether the defendant's car was initially stopped by the police because of the speeding violation or simply for purposes of momentary on-the-street detention to determine the identity of the defendant and his passengers. In either case, the police acted justifiably. Certainly, stopping the driver of a motor vehicle because of a speeding violation is lawful. The Nevada statutes authorize brief detention. *See,* Nev Rev Stat § 171.123 and § 171.1231.

■ In *State v. Cloman,* 254 Or 1, 5-6, 456 P2d 67 (1969), the court said:

"We hold that the initial stopping of the car to determine the identity of the occupant and the vehicle was not an arrest and, therefore, probable cause to arrest was not a prerequisite to the stopping. We further hold that the police can stop a car to determine the identity of the vehicle and its occupants if they have a reasonable suspicion that the car or its occupants have a connection with criminal activity. This 'reasonable suspicion' we deem to be of less quantum than probable cause to arrest. This stopping of a car upon reasonable suspicion does not provide a basis for an officer searching the trunk."

*See, State v. Huddleston,* 5 Or App 9, 480 P2d 454, Sup Ct *review denied* (1971). It is clear from the evidence that before he stopped defendant's car Officer Amthor had a reasonable suspicion that the defendant and his passengers had a connection with criminal activity. After briefly searching the trunk pursuant to defendant's consent, and noting the car to be filled with clothes, rifles and numerous other items, some of which none of the boys could identify, Officer Amthor arrested the three youths.[2] He testified he did not arrest the boys for the speeding violation. He arrested them for receiving stolen property, or "investigation" of receiving stolen property. The arrest was legal as based upon probable cause. The arrest being valid, the subsequent inventory search of the vehicle, being a routine police procedure required following impoundment of the car, was proper under *State v. Raiford,* 7 Or App 302, 490 P2d 1036 (1971). It follows that defendant's motion to suppress was properly denied.

Affirmed.

---

[2] Since the state specifically did not contend that the search of defendant's trunk was justifiable as incident to an arrest, we decline to decide that issue. *See,* State v. O'Neal, 251 Or 163, 444 P2d 951 (1968); State v. Elkins, 245 Or 279, 282-83, 422 P2d 250 (1966).