Argued October 17, 1977. Resubmitted in banc on record and briefs February 23, remanded with instructions May 8, reconsideration denied July 26, petition for review allowed December 19, 1978

STATE OF OREGON, *Appellant,*

*v.*

WILLIAM DEAN CARTER, *Respondent.*

(No. C 76-10-14543, CA 7902)

STATE OF OREGON, *Appellant,*

*v.*

MARION CLAY DAWSON, *Respondent.*

(No. C 76-10-14544, CA 7903)

(Cases consolidated)

578 P2d 790

John W. Burgess, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James A. Redden, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

No appearance for respondent Carter.

Chris P. Ledwidge, Portland, argued the cause and filed the brief for respondent Dawson.

SCHWAB, C. J.

## SCHWAB, C. J.

This is an appeal by the state from an order suppressing evidence. The issues presented involve the validity of the stop of an automobile in which defendants were riding, and the intrusiveness of the stop. These issues, in light of the trial court's findings, require us to reconsider the meaning of an often-used but never-defined term: a "pretext" stop.

### I. The Facts

The record presents some problems, noted below. The following facts seem to be agreed upon, or at least not seriously contested.

The morning of October 14, 1976, Officer Miller was informed that some juveniles were suspects in recent burglaries and that they might be camped near a utility installation. That afternoon as he was driving near the utility installation, he saw a car with two young men inside pulled over, apparently picking up a hitchhiker. According to Officer Miller's subsequent report, he immediately decided to "check out the occupants of the vehicle" because of the reported burglaries.

Officer Miller followed the car for a considerable distance, apparently about three miles. When the posted speed limit dropped from 40 to 30 miles per hour, Miller "paced" the car for about five blocks at 40. Officer Miller turned on his overhead lights and stopped the car.

The driver, defendant Carter, got out and met Officer Miller between their two vehicles. The officer asked him for his operator's license and vehicle registration. Carter gave Miller both documents.[1] The passenger, defendant Dawson, also got out and Miller

---

[1] About this same time, the exact sequence of events not being clear from the record, a young woman got out of her car, said she had been hitchhiking, had been picked up near the utility installation and asked permission to leave. After checking her identification, Officer Miller permitted her to leave.

asked him for identification. Dawson complied. During the exchange between them, Dawson told the officer that the car belonged to his father. Subsequently, Officer Miller looked into the car. He saw a hand-rolled cigarette in the ashtray, green vegetable flakes, stems and seeds on the floor and a package of cigarette papers on the front seat. This led to a thorough search of the car during which officers found about 20 pounds of marihuana in the trunk.

There are conflicts and gaps in the record about what transpired between the time Officer Miller asked defendants for identification and the time he made the plain-view observation of marihuana and related paraphernalia. At one point during the suppression hearing, the officer testified that he looked into the Carter/Dawson vehicle shortly after asking them for identification—a possible implication of this testimony being that he saw marihuana in plain view at that time.

Officer Miller's written report, introduced at the suppression hearing, tells a different story. It recites that after obtaining drivers' licenses and vehicle registration, the officer returned to his patrol car to make a "records check" by radio on Carter, Dawson and their vehicle. Miller learned, as his written report puts it, "Both subjects were clear and the vehicle was clear." However, Miller wanted to make further inquiry because the radio report indicated the car was registered to the A-1 Maintenance Company, not in the name of Dawson's father as Dawson had implied. This testimony is difficult to understand; it seems obvious that Miller would have known who the registered owner was as soon as he saw the vehicle registration, which was before he ran the "records check."

Officer Miller's written report continues, stating that after receiving the radio report, he again approached the defendants, who were standing outside their car, apparently near the rear of the passenger

side. Officer Miller asked, "Is there anything in the car that shouldn't be there?" or words to that effect.[2] The defendants replied in the negative. The officer next asked permission to look inside the car. Defendants consented. Officer Miller then made the plain-view observations described above. The importance of these various versions of the facts of this plain-view observation is explained in Part IV, *infra.*

II. The Issues

■   There is some disagreement over the issues framed in the trial court. It is, of course, the obligation of the litigants to frame the issues in the trial court at the suppression hearing. *State v. Miller,* 269 Or 328, 330-32, 524 P2d 1399 (1974), citing *State v. Johnson/Imel,* 16 Or App 560, 519 P2d 1053, *rev den* (1974), with approval. And the appellate courts cannot reach issues that were not raised by the parties in the trial court. *State v. Hickmann,* 273 Or 358, 540 P2d 1406 (1975).

As we interpret the record, the defendants conceded that Officer Miller had probable cause to search further after seeing what he had probable cause to believe was marihuana and related paraphernalia. Defendants' primary argument was that this plain-view observation was invalid because Officer Miller's stop of their car was invalid. The state's primary argument was that the stop was justified as a *Terry*-type[3] stop to investigate the recent burglaries. The state alternatively relied upon the speeding infraction as a justification for the stop. The defendants responded that the traffic infraction was merely a "pretext" to stop and alternatively that if the infraction justified the stop, what followed was too intrusive.

Contrary to the suggestion in Judge Thornton's separate opinion, this case was not treated in the trial

---

[2] The record contains no explanation of why Officer Miller thought the question he asked would clear up his concern about the registered owner of the vehicle.

[3] *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

court as a consent-search case. The thrust of the state's argument to the trial court was that it relied on plain view of contraband to justify a subsequent search rather than consent to search. Nor did the state ever argue in the trial court—although admittedly it could have—that Dawson's bloodshot eyes, etc., gave Officer Miller grounds to make inquiry beyond that properly incident to stop for exceeding a posted speed.

We turn to the issues as framed by the parties in the trial court: the validity of the stop and the intrusiveness of the stop.

III. The Stop

The trial court rejected the state's *Terry* contention, concluding the facts do not indicate any reasonable suspicion that the occupants of the car had any connection with criminal activity. The trial court was correct. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

The trial court found Miller's testimony that defendants were speeding credible, but concluded the traffic infraction was merely a "pretext" for stopping defendants' car in order to conduct the questioning which led to the discovery of the marihuana:

> "* * * [Officer Miller] was very straightforward and very candid in his testimony. In listening to him, I couldn't help but feel that he stopped the car, not because they were going 10 miles over the 30 miles an hour speed limit, but for other reasons. * * *"

There is abundant evidence to support the trial court's latter finding. Officer Miller testified that defendants' car was traveling at the speed of traffic, was not being driven erratically, and that it was not unusual for cars to travel at 35 to 40 miles per hour in that area. There was no evidence that Miller said anything to defendants about having stopped them for speeding between the original stop and their subsequent arrest for criminal activity in drugs. It was only after the arrest on drug charges that Miller issued a citation to Carter for violation of the basic rule.

The trial court's findings compel confronting the law of "pretext" stops. Many cases using that term are collected in Annotation, 10 ALR3d 314 (1966). In some cases the term is apparently used to mean that the stopped driver had, in fact, committed no traffic offense. We have held a stop on such facts invalid without using the label "pretext." *State v. Johnson, Wesson,* 26 Or App 599, 554 P2d 194 (1976). But in most cases "pretext" is used when: (1) the stopped driver had, in fact, committed a traffic offense, usually minor in nature; and (2) the stopping officer had some additional reason, suspicion or ulterior motive—not sufficient standing alone—for making the stop. On such facts, many cases hold the stop to be invalid as a "pretext."

We think the question comes down to whether the proper test is objective or subjective. The trial court's findings, paraphrased, are that there was an objectively reasonable basis for stopping defendants' car (speeding), but that Officer Miller's subjective reason for doing so was something different. Is the objective reason or the subjective reason controlling?

In Oregon, the slate is remarkably sketchy and inconclusive. The Supreme Court upheld a pretext stop in an old case, *State v. Christensen,* 151 Or 529, 51 P2d 835 (1935). An officer following a suspected bootlegger stopped him when he drove 27 miles per hour in a 25 mph zone. The Supreme Court saw nothing troublesome about the stop since a traffic violation had actually occurred. Evidence resulting from the officer's observations after the stop was held to be admissible.

The Supreme Court also upheld what it seems to have assumed was a pretext stop and arrest in *State v. Allen,* 248 Or 376, 434 P2d 740 (1967). "It is obvious from the record that the police were primarily interested in the defendant as a burglary suspect and that the traffic charge was used to obtain some measure of control over the defendant while the

burglary investigation proceeded * * *." 248 Or at 383-84.

More recently, the Supreme Court in *dicta* expressed a more critical attitude toward pretext stops and arrests in *State v. Florance,* 270 Or 169, 187-88, 527 P2d 1202 (1974). Among other things, the court stated that "a different result [from upholding a search] might well * * * follow if such a search were made after a so-called 'pretext arrest' for the violation of a minor traffic ordinance." 270 Or at 187. The facts in *Florance,* however, did not raise any pretext issue, and the court's language may only be a recitation of what it thought to be accepted wisdom.

The most recent Supreme Court word on the subject is *State v. Valdez, supra,* which can be interpreted as containing conflicting implications. The case involved a police stop for a trivial traffic offense; the actual purpose of the stop was to get a closer look at some suspicious characters. The Supreme Court held the stop invalid on statutory grounds, ORS 131.615, concluding that there was not sufficient reasonable suspicion of connection with criminal activity. The Supreme Court stated that the stop rules of *Terry* and ORS 131.615 were

"* * * *an objective test* * * *: In other words, the test should be *what a reasonable officer would think* in this situation and not what this particular arresting officer thought." 277 Or at 626.

This can be read as rejection of the concept of a stop's being invalid as a pretext. However, the Supreme Court also said: "One officer testified that prior to stopping the vehicle he observed the driver of the vehicle fail to turn on his signal for a left turn, but he specifically said that that was not why he stopped the vehicle." 277 Or at 624. This can be read as reliance on one officer's subjective state of mind.

While it may be argued that *Valdez,* because it invalidated a stop, implicitly held a pretext traffic stop to be impermissible, it is unlikely the Supreme Court

would treat such a major issue *sub silentio* or in a single sentence, particularly in the course of an otherwise methodically explicit opinion. We can only conclude *Valdez* did not directly consider the pretext problem.

Decisions of the Court of Appeals point in different directions. In *State v. Jackson,* 27 Or App 879, 557 P2d 691 (1976), *rev den* (1977), and *State v. Huss,* 23 Or App 118, 541 P2d 498, *rev den* (1975), we upheld stops for driving with expired license plates; but both decisions state that the stops were not merely a pretext for an exploratory search, at least implying that a pretext finding would have changed the result. Yet, *State v. Sell,* 9 Or App 299, 496 P2d 44, *rev den* (1972), upholds a stop for going 30 miles per hour in a 25 mph zone under circumstances strongly suggesting a pretext, i.e., subjective reason for the stop other than speeding.

■   Prior Oregon cases on *stops* do not coherently adopt either an objective test or a subjective test. There is greater consistency in the law governing *arrests* and *searches.* In Oregon, it is reasonably well settled that arrests and searches are judged by a reasonable-person objective standard; the fact that a police officer articulates his subjective reason for arresting or searching that happens to be invalid is irrelevant if a court later concludes that a reasonable person, viewing the facts objectively, would have had probable cause to arrest or search. *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969); *State v. Brewton,* 19 Or App 899, 529 P2d 967 (1974), *rev den, cert den* 423 US 851 (1975); *State v. Holmes,* 17 Or App 464, 522 P2d 900 (1974); *State v. Childers,* 13 Or App 622, 511 P2d 447, *rev den* (1973); *State v. Temple,* 7 Or App 91, 488 P2d 1380, *rev den* (1971), *cert den* 406 US 973 (1972); *State v. Keith,* 2 Or App 133, 465 P2d 724, *rev den* (1970).

■   Given that arrests and searches are judged by an objective standard, we see no persuasive reason to evaluate stops by a different standard. The major

thrust of the Supreme Court's decision in *State v. Valdez, supra,* applies an objective standard to stops. We therefore conclude and hold that stops are to be tested solely by whether the facts perceived by the stopping officer constitute *objective cause* for the stop; the stopping officer's *subjective reasons* have nothing to do with the legality of a stop.[4]

This rule does not abolish the adversary system. As stated in Part II, *supra,* it remains the obligation of the parties to frame the issues at a suppression hearing and the courts are not free to construct an objective theory to hold a stop valid or invalid that has nothing to do with the contentions of the parties. An officer who made a stop must still state what he perceived and reasonably believed the facts to be. The officer may also state what conclusions his subjective reasoning process led him to, *i.e.,* his own conclusion about his legal authority. But it remains the obligation of the judiciary to reach the ultimate legal conclusion about the officer's legal authority; and in so doing we may consider the parties' arguments about what a reasonable officer objectively could have concluded, not just arguments about what the particular officer subjectively did conclude.

■ In this case, the state contended in the trial court that there was a reasonable and objective basis for the

---

[4] Judge Tanzer's separate opinion argues we err in applying the "stop" rules of *Terry v. Ohio, supra,* and ORS 131.615 when defendants had committed an offense (speeding) in the officer's presence. Our first answer is that it would not seem significant whether we evaluate the stop of a motorist who has committed a traffic offense based on the law of arrests or on the law of stops, given that we apply the same objective test to an arrest and to a stop.

Our further answer is that the normal, routine stop of a motorist who has committed a traffic offense for the purpose of issuance of a citation does not fit comfortably into any constitutional pigeonhole. It is not exactly a *Terry*-type stop, nor is it an arrest, at least of the custodial type. Analysis is further complicated by the Oregon treatment of most traffic offenses as civil, not criminal in nature. *See Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 570 P2d 52 (1977).

The reality, however, that routine traffic stops are not easily labeled is not a persuasive reason for failing to accord Oregon motorists the minimum protections that surround *Terry*-type stops.

stop—speeding. We agree, and hold the stop was valid.

## IV. The Intrusiveness of the Stop

■ Two bodies of law are germane to what an officer may do after making a traffic stop in Oregon. One is constitutional. An officer may, constitutionally, search the person of the driver incident to custodial arrest, *State v. Florance, supra,* but assuming *State v. Krogness,* 238 Or 135, 388 P2d 120, *cert den* 377 US 992 (1964), is still good law, may not, constitutionally, search the interior of the vehicle based solely on a stop for a traffic offense.

■■ Moreover, constitutional law provides that a stop can be no more intrusive than necessarily required by the objective reason giving rise to the stop. *State v. Evans,* 16 Or App 189, 517 P2d 1225, *rev den* (1974). ORS 131.615 appears to codify the constitutional limitation:

"* * * * *

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

Detention and inquiry beyond the time, place and subject-matter limits codified in ORS 131.615—all components of what we call "intrusiveness"— constitute an invalid "random intervention into the liberty and privacy of a person." *State v. Evans,* 16 Or App at 197.

The other relevant body of law is solely statutory. ORS 484.435 provides:

"(1) Searches and seizures otherwise authorized by law incidental to an arrest shall not be authorized if the arrest is on a charge of committing a Class B, C or D traffic infraction unless the arrest is a full custody arrest in which the person arrested is to be lodged in jail, and the decision to place the person arrested under full

custody arrest is based upon specific articulable facts justifying his being lodged in jail rather than being given a traffic citation as provided in this chapter and released.

"(2) Nothing in subsection (1) of this section shall be construed to forbid a frisk for dangerous or deadly weapons authorized under ORS 131.605 to 131.625."

ORS 484.435(1) expresses a legislative preference for issuance of citations in lieu of custodial arrests and enacts a legislative limitation on searches of motorists stopped for traffic offenses that is arguably more restrictive than the Oregon Supreme Court's rule in *State v. Florance, supra.* ORS 484.435(2), in using the term "Frisk"—a term of art normally associated with *Terry*-type stops—indicates the legislature may have been as uncertain as we are, *see* n 4, *supra,* about the most appropriate analysis and analogy in a traffic-stop situation.

■  The constitutional and statutory law blends into a single rule: Traffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop.

■■  The alternative possible interpretations of this record illustrate the rule. One possibility—supported by part of Officer Miller's testimony at the suppression hearing—is that he made a plain-view observation of marihuana in the course of stopping defendants for speeding, or requesting drivers' licenses and registration, or while making inquiry relating to the speeding infraction. If these are the facts, Officer Miller was authorized to inquire and search further. The other possibility—supported by Officer Miller's written report—is that after the "records check" came back "clear," he began a series of inquiries that were not related to the traffic infraction: "Do you have anything in the car that shouldn't be there? Can I look into the car?" If these are the facts, and it was only *after*

this irrelevant questioning that Officer Miller observed marihuana, his observation was tainted by the unreasonable intrusiveness of the stop.

Simply stated, when the "records check" came back "clear," Officer Miller could do no more than write a citation and send defendants on their way. He could not begin questioning or an investigation that had nothing to do with the objective reason for the stop (speeding). If he did so, the officer extended the duration of the stop without legally sufficient articulated cause.

The distinction between the two possible interpretations of the record may be subtle, but constitutional and statutory policy requires that it be accorded legal significance to prevent every traffic stop from becoming a possible excuse for a general investigatory detention. Otherwise, every motorist stopped for a traffic offense could be detained and asked questions such as: "What were you doing last Saturday evening?" Judge Tanzer's separate opinion would apparently permit such an investigatory detention. We do not.

As we interpret the record, the trial court recognized the intrusiveness rule we articulate, but never made relevant findings of fact because of its conclusion the stop was invalid. We have noted the record is capable of different interpretations on the intrusiveness issue. We remand for findings on this issue. *State v. Johnson/Imel,* 16 Or App 560, 519 P2d 1053, *rev den* (1974).

Remanded with instructions.

**THORNTON, J.**, concurring in part; dissenting in part.

I agree with the majority that the stop was valid and that the trial judge erred in ruling to the contrary. Likewise, I am in full accord with the objective test rule announced in the majority opinion.

I do not, however, agree with the majority's conclusion that the arresting officer's (Officer Miller) actions after the stop were unreasonable. The majority opinion disregards the fact that while the trial judge found the stop invalid, he nevertheless concluded that Officer Miller's actions *after* the stop were not unreasonable. In addition, the judge stated:

> "Some claim has been made that they had to be advised of Miranda. I don't think that is true. The case law is clear that under these situations they were not a focal suspect in custody and, therefore Miranda didn't apply. So I would think there would be a valid consent if the stop had been proper. I recognize that is a reasonably close question. *I just don't think the officers either have to shut their eyes to what is in front of them.*" (Emphasis supplied.)

I summarize my conclusions as follows:

Officer Miller was entitled to stop the automobile and request identification of the occupants, *State v. Jackson,* 27 Or App 879, 557 P2d 691 (1976), *rev den* (1977), and *State v. Huss,* 23 Or App 118, 541 P2d 498, *rev den* (1975); that having made a legal stop, he was justified by reason of the question over ownership of the automobile to make further inquiries related to ownership; that having observed that Dawson was "unsteady," his speech "slurred" and his "eyes * * * bloodshot," the officer was further justified in suspecting that he was under the influence of drugs, and that the vehicle might contain evidence thereof, *State v. Cortez,* 10 Or App 122, 497 P2d 1228, *rev den* (1972); that the temporary detention of defendants for the purpose of these inquiries was not an unreasonable detention under these circumstances, *Pennsylvania v. Mimms,* 434 US 106, 98 S Ct 330, 54 L Ed 2d 331 (1977); that the officer could properly ask defendants for permission to search the vehicle; that the discovery of the marihuana and pistol was the result of a consent search, *State v. Douglas,* 260 Or 60, 488 P2d 1366 (1971), *cert den* 406 US 974 (1972); *State v. Sell,* 9 Or App 299, 496 P2d 44, *rev den* (1972); and that the

officer was not required to advise either defendant that he had a right to refuse to consent to the search, *State v. Flores,* 280 Or 273, 570 P2d 965 (1977).

Finally, I cannot agree that the rule in *State v. Hickmann,* 273 Or 358, 540 P2d 1406 (1975), which is referred to in the majority opinion, is applicable here.

In *Hickmann* our Supreme Court held inter alia that

"* * * a question [whether the defendant consented to the search of his tepee] not raised and preserved in the trial court will not be considered upon appeal * * *.

"Since the State did not rely upon 'consent' as a basis to justify the warrantless search at the trial court level or on appeal, the decision of the Court of Appeals is reversed." 273 Or at 360.

In my view *Hickmann* is inapposite for the following reasons: First, unlike in *Hickmann,* the question now before us, *i.e.,* whether the search of the automobile was consented to, was raised both in the trial court and on appeal.

Second, here the trial judge ruled that the search was valid under all the facts and circumstances, although he ruled that the stop was invalid.

Third, the state in its brief on appeal emphasized that the trial judge had found the search to be authorized.

Fourth, the state had also pointed out in its brief on appeal that: "It should also be remembered that Dawson manifested symptoms of being under the influence of drugs or alcohol."

As the majority opinion states:

"* * * [T]he fact that a police officer articulates his subjective reason for arresting or searching that happens to be invalid is irrelevant if a court later concludes that a reasonable person, viewing the facts objectively, would have had probable cause to arrest or search. [Citing cases.]" 34 Or App at 29.

I would therefore reverse and remand.

**TANZER, J.,** dissenting.

I must dissent. I believe that the majority analysis (or misanalysis) of pretext stops fails to protect privacy and that its newly spun restrictions on police action following a stop either are illusory or, if effective, unnecessarily bar hitherto permissible police activity.

The majority correctly characterizes the state of Oregon case law as sketchy and inconclusive on this issue.[1] There is only one case directly in point, *State v. Christensen,* 151 Or 529, 51 P2d 835 (1935), and the difference of opinion between the majority and me is crystallized by our differing approaches to that case. In *Christensen,* an officer, suspecting bootlegging, followed the defendant's car until he drove 27 miles-per-hour in a 25-miles-per-hour zone, and stopped him for the traffic offense. The stop led to observations which led to an arrest and search, all of which the Supreme Court upheld.

I view *Christensen* as a constitutional anachronism; interesting as a historical curio, but philosophically obsolete. It is inconceivable that today's Supreme Court would decide the case the same way as in 1937. The majority of this court, however, would decide as in 1937. By holding that the police may constitutionally interfere with liberty wherever there is suspicion or knowledge of an offense or crime, no matter how trivial, regardless of the actual police purpose, this court rescues *Christensen* from the juridical dustbin

---

[1] Federal law is not much help either. In *United States v. Lefkowitz,* 285 US 452, 467, 52 S Ct 420, 76 L Ed 877 (1932), the United States Supreme Court stated in dictum: "An arrest may not be used as a pretext to search for evidence."

In *Amador-Gonzalez v. United States,* 391 F2d 308 (5th Cir 1968), a traffic stop in a border situation was upheld as valid, but the incidental search was invalidated as a pretext. The rationale was never compelling and must be considered overruled by *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), and *Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973).

In *State of Montana v. Tomich,* 332 F2d 987 (9th Cir 1964), a pretext arrest was held invalid per se, but there was no reasoning to support the conclusion. *See also, Taglavore v. United States,* 291 F2d 262 (9th Cir 1961).

and restores it to full vigor as a statement of contemporary constitutional doctrine. The holding is inconsistent with the approach taken in recent Supreme Court cases and constitutionally unwise.

## Recent Oregon Cases

The majority correctly identifies the language in *State v. Florance,* 270 Or 169, 188, 527 P2d 1202 (1974),[2] as an expression by dicta of apparently accepted wisdom. Dicta or not, however, the language indicates a judicial disposition to view pretextual police action as morally bad and constitutionally intolerable. While one should not read too much into dicta, the predisposition of the Supreme Court on this issue is obvious.

*State v. Cloman,* 254 Or 1, 456 P2d 67 (1969), is the case most indicative of the Supreme Court's approach. There the police had probable cause to arrest defendant for copper wire burglary, but, being unsure of their legal footing, they arrested him on an announced charge of being abroad after hours. The after-hours ordinance was thereafter declared unconstitutional. Judicial analysis was not constrained by the officer's choice of charge. Rather, the court examined the underlying basis for the arrest, *i.e.,* investigation of wire theft, and upheld the search as based on sufficient probable cause. The court stated that "if the officers had probable cause to arrest, the arrest made is not rendered illegal because the officers expressed another and improper cause for arrest." 254 Or at 12.

---

[2] "We do not sanction either the abuses condemned by *Rochin* or 'pretext' arrests. Regardless of the rule of *Robinson,* there must be probable cause for an arrest * * *. There may also be other circumstances under which a search made by an arresting officer may be illegal, even though made as an incident to a lawful custodial arrest. These possibilities, however, including the possibility that some police officers, by 'pretext arrests' or arrests without probable cause, may abuse their sworn duty to obey the law, as well as to enforce it, [don't prevent us from adopting the *Robinson* rule]." *State v. Florance,* 270 Or 169, 188, 527 P2d 1202 (1974).

This statement does not purport to establish an entirely objective standard, free from motivational considerations, for searches and seizures which would automatically validate any search or seizure with a fact-based pretext. Rather, it indicates that court's sympathy for the police who are uncertain as to which of two grounds of arrest is more secure and a corresponding judicial willingness to ignore the officer's reliance upon a pretext charge of convenience.

The majority cites *Cloman* (34 Or App at 29) and a series of our opinions in support of its theory that the validity of the pretext must be evaluated objectively and the officer's actual motivation is irrelevant. *Cloman* holds no such thing; indeed, *Cloman* holds the opposite. The issue in such cases is whether the validity of a search or seizure is determined from the pretext charge or from the actual underlying charge. The suspicion or probable cause must be assessed objectively for either charge. The decision in such cases is not whether to assess objectively, but which charge to assess. The implicit answer in *Cloman* is clear: the court will look objectively to the reality of the situation and particularly to the actual underlying police purpose regardless of the announced pretextual basis of a stop, search or arrest. The majority's reliance upon *Cloman,* which upheld the arrest on the underlying charge, as authority for the upholding of a pretext stop is patently erroneous.

The Supreme Court followed the *Cloman* approach in *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977). They invalidated a search because there was no cause for reasonable suspicion regarding the criminal activity under investigation. The court gave no significance to the observed traffic offense. Were the rule advanced by the majority the law, then the *Valdez* search should have been upheld on the basis of an objectively extant traffic offense. Instead the Supreme Court disregarded the pretextual traffic charge and looked only to the actual motivation.

This court has generally followed the *Cloman* approach by looking to the underlying cause. *See, State v. Brewton,* 19 Or App 899, 901-02, 529 P2d 967 (1974) *rev den, cert den* 423 US 851 (1975), *State v. Temple,* 7 Or App 91, 96-7, 488 P2d 1380 *rev den* (1971) *cert den* 406 US 973 (1972), and *State v. Johnson, Wesson,* 26 Or App 599, 603, 554 P2d 194 (1976), which adopted the dissenting opinion of Schwab, C. J., in *State v. Gibbons,* 21 Or App 339, 353, 535 P2d 561 *rev den* (1975).[3]

## Scratch Analysis

Absent controlling precedent from either of our Supreme Courts, we should now formulate a rule for application in this and subsequent cases, consistent with the *Cloman* approach, which will function best in light of the nature of the protection afforded by the Fourth Amendment, and the nature and gravity of the danger to that protection presented by pretext stops and arrests.

The purpose of the Fourth Amendment is to protect the individual from arbitrary official interference with his freedom and intrusion into the privacy of his possessions. The method of the Fourth Amendment is to bar any official intrusion as presumptively unreasonable unless the government can give reason justifying both the selection of the person, place or thing interfered with and the nature and intensity of

---

[3]I find no instance where this court has dealt explicitly with the pretext arrest or stop issue. The closest we have come to meeting the issue was in *State v. Huss,* 23 Or App 118, 541 P2d 498 *rev den* (1975). There the officer had advance information regarding defendant's car, but the nature of the officer's underlying purpose, if any, was not stated. The officer noticed expired license plates on defendant's car, followed it until an unsignalled turn was made, and then stopped it. The arrest and search were held to be "legitimate" over defendant's contention that the arrest was a "pretext," because the officer gave reasons to support his decision to arrest rather than to cite. The analysis, however, concerned itself solely with the objective basis for the traffic arrest and incidental search. The court did not deal with the pretext arrest contention except, perhaps, by silent implication. The approach is the converse of that later taken by the Supreme Court in *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977), and the dicta in *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974).

[ 39 ]

the interference. *State v. Evans,* 16 Or App 189, 517 P2d 1225 *rev den* (1974).

The first alternative course, that chosen by the majority, is to unqualifiedly allow pretext stops and arrests whenever there are facts which justify the pretext. Such a per se rule, however, would reduce the shield of the Fourth Amendment to a sieve because one who lives in a complex and pervasively regulated society can hardly avoid occasional violations of law. In the course of criticizing the *Robinson/Gustafson*[4] rule, Professor LaFave observed:

> "* * * Given the fact that 'in most jurisdictions and for most traffic offenses the determination of whether to issue a citation or effect a full arrest is discretionary with the officer,' and that 'very few drivers can traverse any appreciable distance without violating some traffic regulation,' this is indeed a frightening possibility. It is apparent that virtually everyone who ventures out onto the public streets and highways may then, with little effort by the police, be placed in a position where he is subject to a full search. Nor is one put at ease by what evidence exists as to police practices in this regard; it is clear that this subterfuge is employed as a means of searching for evidence on the persons of suspects who could not be lawfully arrested for the crimes of which they are suspected.

> "* * * After all, the 'paramount purpose of the fourth amendment is to prohibit arbitrary search and seizures as well as unjustified searches and seizures.' * * *" (Footnotes omitted.) W. LaFave, *The Robinson Dilemma,* 1974 Sup Ct Rev 127, 152-53.

The mere existence of a 2-miles-per-hour violation of a speed limit, a burned out tail light, an unsignalled turn, standing off the curb before the walk signal turns on, or a meander over the bounds of a crosswalk, let alone loitering, disrespect to an officer or disorderly conduct, should not serve to make reasonable a search or seizure which would be unreasonable in the absence

---

[4] *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1963); *Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973).

of a commonplace and often inadvertent law violation. If we are subject to official interference whenever there is factual justification for a suspicion or belief that we have offended any statute, ordinance or regulation, however minimally, then there is not much Fourth Amendment protection from arrest left in modern society. Indeed, what boy or girl is free from police investigative detention now that we have upheld a stop for failure of a bicycle rider to stop completely at a stop sign? *State v. Tucker,* 34 Or App 203, 578 P2d 803 (1978). I would conclude that a pretext stop or arrest is not constitutionally valid simply because a trivial offense is observed.

On the other hand, an absolute rule the other way is equally undesirable. If a policeman observes suspicious activity which would ordinarily cause him to take action, the fact that he suspects or is investigating a graver violation of law should not bar him from taking such action. Suspicion of greater crime should not immunize an individual from the consequences of a smaller crime. In other words, it is reasonable for an officer to act as he ordinarily would regarding a lesser crime even though he may suspect a person of more serious criminal activity. In that case, the stop, arrest or search regarding the lesser crime is not actually pretextual in character.

There is a course which would avoid the pitfalls of both per se rules and yet accomplish both the public and private purposes of the Fourth Amendment. It is arbitrary official selection that offends the Fourth Amendment. The prohibition of arbitrarily selective intrusion is also one of the express purposes of the codification upon which the majority relies in part. The Commentary to the Proposed Oregon Criminal Procedure Code at p. 25, § 30 (1972), explains the phrase "reasonably suspects":

> "* * * There must be some facts or circumstances that distinguish the conduct of the individual stopped from that of other individuals who are not stopped."

Arbitrary selection can be protected against. If the stop or arrest would ordinarily have been made as a matter of policy or customary practice, regardless of whether other criminal activity is suspected, and the officer was acting pursuant to that policy or practice, then it should be regarded as reasonable and not pretextual. *State v. Huss,* 23 Or App 118, 541 P2d 498 *rev den* (1975), is such a case. If on the other hand the stop or arrest is pretextual, *i.e.,* it would not ordinarily have been made, then we should continue to follow the approach of the Supreme Court in *Cloman* and this court in *Brewton, Temple* and *Smith, Wesson.* The court should look through the pretextual justification for the police action and examine instead for the existence of sufficient cause in light of the underlying criminal activity which the police officer is actually pursuing. *Cloman* presents the only realistic approach.

Although it may be a difficult task, it is within the competence of courts to determine after an evidentiary hearing whether the action of the officer in a given situation is pretextual or not. Generally, just as in this case, we may expect testimonial candor from the officers. In *State v. Tucker,* the officer admitted (as he could hardly have denied) that he does not ordinarily stop bicycle riders who fail to completely stop at a stop sign. Additionally, Professor LaFave has suggested that such determinations can be made from the circumstances of the individual case, *e.g.,* whether the officer was assigned not to traffic or general law enforcement, but rather to enforcement of the drug laws, W. LaFave, *The Robinson Dilemma,* 1974 Sup Ct Rev 127, 155 n 129, or whether the defendant was arrested for a minor offense when the established practice is to merely give a ticket, W. LaFave, *Search and Seizure: Course of True Law,* 1966 U of Ill L F 255, 282. Moreover, the United States Supreme Court, in the course of upholding arrests, noted pointedly in *United States v. Robinson,* 414 US 218, 221, n 2, 94 S Ct 467, 38 L Ed 2d 427 (1973), that a traffic arrest was

required by the manual of procedures of the police department, and in *Gustafson v. Florida,* 414 US 260, 265, 94 S Ct 488, 38 L Ed 2d 456 (1973), as in our approach in *Huss,* that the traffic arrest was consistent with customary procedure. The decision to stop is no less capable of judicial scrutiny than in the decision to arrest, as in *Robinson* and *Gustafson.* Such decisional circumstances enable courts to determine whether a stop or arrest is pretextual just as they make other Fourth Amendment determinations from evidentiary hearings.[5]

There may be close cases, but that is a reason for careful fact finding, not for a withholding of the protection of constitutional doctrine.

## Dispositional Errors of the Majority

The majority and I agree that there was insufficient cause to constitute a reasonable suspicion of burglarious activity and that the stop cannot be justified on that basis. From that point on, however, the majority's fallacy is twofold.

First, the majority holds that the scope of detention and inquiry permitted constitutionally and by ORS 131.615 where there is reasonable suspicion was exceeded. Neither the principle nor the statute are applicable in this case, however, because the police action was not based on reasonable suspicion. The police action regarding the traffic stop may be limited by whatever limitations apply to the traffic stop; the police action regarding burglary must be scrutinized in view of the Fourth Amendment. In neither situation, however, is ORS 131.615 applicable: the traffic offense was observed, not suspected; the burglary was not reasonably suspected. The statute on reasonable suspicion is immaterial as to either charge.

---

[5] Professor LaFave has argued both ways. In arguing that the products of traffic stops and searches should not be available in the trial of greater crimes, he wrote, "I doubt whether it is within the ability of the trial and appellate courts to determine with any fair rate of success the uncommunicated intentions or expectations of the police officer." W. LaFave, *The Robinson Dilemma,* 1974 Sup Ct Rev 127, 154.

The doctrine created by the majority—limitation of police questioning to the pretext charge—is not only theoretically unsound, but practically unsound. The reason it will not work on the street is simple: The very reason that police make pretext stops is to create opportunity for investigative observations. *State v. Tucker* is such a case in which the stop for a bicycle riding offense is simply a device to freeze the situation for whatever investigative opportunities might be generated. Typically, this means making an otherwise unavailable vantage point for plain view observation. It is the marijuana seeds on the rear seat, the roach in the ashtray, the ski mask on the floorboard, that rob the majority doctrine of its intended surgical quality. Furthermore, the stop is the setting for observation of the bulge-in-the-jacket (which may look like a weapon but is almost invariably drugs) and the furtive gesture (all gestures beyond absolute immobility turn out to be furtive in a stop situation) which leads to stops and frisks which generally relate to the underlying suspicion rather than the pretext stop. In sum, it sounds appealing to limit police action to the pretext charge, but in reality the doctrine is illusory.

Second, the majority holds as a matter of constitutional law that the asking of a question by a policeman is itself an act constituting detention, *i.e.,* that "[t]hese questions * * * extended the duration of the stop." The novel concept of a question as a detention is fraught with unforeseeable implications. At the least, for example, it overrules *sub silentio* the rule that questioning upon a traffic stop is noncustodial, *see, e.g., State v. Egger,* 24 Or App 927, 547 P2d 643 *rev den* (1976), and *State v. Henson,* 23 Or App 234, 238, 541 P2d 1084 (1975) *rev den* (1976), a rule which, until now, was sufficiently beyond question that we applied it without opinion, *State v. Flury,* 27 Or App 123, 555 P2d 209 (1976). It bases this doctrine on *State v. Evans,* 16 Or App 189, 517 P2d 1225 *rev den* (1974), but that reliance is erroneous: In *Evans,* the stop itself was unjustified by cause; here the premise of the majority

is that the stop was lawful. Fifth and Sixth Amendment considerations aside, the police, like anyone else, may lawfully ask questions of anybody, detained or not. It is seizure which the Fourth Amendment regulates. Thus our examination in pretext stop cases must relate to the lawfulness of the stop itself. Under the majority rule, however, which uniquely in the law and from whole cloth extends the Fourth Amendment to questioning, an officer would have to measure every word he utters against some new standard and that result is impracticable on the street. There may be merit in the idea that substantial incremental detention for the purpose of unrelated questioning is itself a seizure, but I see no reason to promulgate such a rule here.

## Disposition

The resolution of this case need not be so complex or revolutionary. The stop cannot be justified on the basis of reasonable suspicion of burglary. The traffic stop was lawful (or non-pretextual) if it was and ordinarily would have been made under the facts presented pursuant to written or customary policy. It was not lawful if the stop was arbitrary. Although the policy issue was not contemplated at the initial hearing, the officer testified that he was not acting in reliance upon the traffic violation. Therefore the stop was constitutionally unauthorized and its fruits must be suppressed.

For these many reasons, I dissent.

Roberts, J., joins in this dissent.