Argued October 16, reversed and remanded for trial December 11, reconsideration denied January 23, petition for review allowed February 13, 1979, 285 Or 195

# STATE OF OREGON, *Appellant,*
## *v.*
# MARK GEORGE EMIL PELLER, *Respondent.*
## (No. 34640, CA 11128)

587 P2d 510

Catherine Allen, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

David W. Hittle, Salem, argued the cause for respondent. With him on the brief was Gary L. Gardner, Salem.

Before Schwab, Chief Judge, and Johnson, Gillette and Roberts, Judges.

GILLETTE, J.

**GILLETTE, J.**

This is a criminal case in which defendant was charged with possession of a stolen motor vehicle and criminal activity in drugs. The State appeals an order made prior to trial suppressing certain evidence and statements obtained after a warrantless search of defendant's residence. We reverse.

The facts are: At approximately 4 p.m. on December 8, 1977, Deputy Holmes of the Yamhill County Sheriff's Department advised Deputy Elle of the same department that Holmes and another officer had been watching a certain black and orange Porsche since Halloween. Holmes had learned that the Porsche displayed an improper rear license plate and that, according to the Department of Motor Vehicles, the plate should have been displayed on a Pontiac rather than a Porsche. Holmes had been observing the Porsche because he believed that in order to issue a citation for driving with a switched plate he had to wait until the Porsche was moving. Elle advised Holmes that it was not necessary to wait and offered to help establish the identity and ownership of the Porsche.

Holmes and Elle drove to 665 East 26th Street in McMinnville, where they saw the Porsche parked in the driveway. They went to the door and knocked. Defendant answered the door and spoke with the officers in the breezeway between the residence and the garage. Elle advised defendant of the purpose of the call and asked who owned the Porsche. Defendant told Elle that it belonged to a Mr. Huycke, defendant's roommate, who was at work and would be home later that evening. Elle advised defendant of his *Miranda* rights but did not arrest him.

Elle asked defendant where Mr. Huycke could be located. Defendant told Elle that he was at his girlfriend's house near the high school, that her name was Johnson and that Huycke should be home before long.

[ 469 ]

Defendant refused to allow Elle to use his telephone. Elle left a business card with defendant, indicating that he wanted Huycke to contact him as soon as he came home. Sometime during that first contact with defendant, Deputy Holmes advised Elle that when another deputy had stopped the Porsche sometime earlier, defendant was driving and that defendant had lied to the officer about something.

When Elle and Holmes left defendant's residence, Elle decided to try to locate the address of the girlfriend and contact Huycke. He had some doubt in his mind about whether defendant was telling the truth about where Huycke was.

When the officers left the residence, they rechecked the registration of the rear license plate on the Porsche and confirmed that it should be displayed on a Pontiac. Elle then had the dispatcher check the city directory to locate anyone by the name of Johnson in the area of the high school or on either side of the school. They were unable to identify a Johnson anywhere in the vicinity of the school. Elle then returned to defendant's residence to confront defendant with the fact that the information defendant had given him was either misinformation or false.

Between fifteen and twenty minutes after the first contact with defendant, the officers knocked at the door, identified themselves and called defendant's name. They stayed at the door between a minute and two minutes. Elle knocked several times with his flashlight on the metal door. He was satisfied that anyone inside would have heard the noise. As they were leaving, Elle asked Holmes if he had ever checked the front license plate on the Porsche. When Holmes told him he had not checked, Elle stepped between the garage door and the front of the Porsche and checked the plate. The front plate was different than the rear plate. Elle checked the front plate with the Department of Motor Vehicles and received a report that the plate belonged on a 1974 Plymouth.

Elle had experience with switched plates and auto theft investigation. Because of that experience, he suspected at that point that the Porsche was stolen. Two weeks earlier he had reviewed the latest FBI report indicating that at least two major theft rings were working in the Metropolitan area, including the McMinnville area, and dealing specifically in stealing and concealing the identity of Porsches. He knew from that report that as of the first six months of 1977, there were twenty-two Porsches still listed as stolen from the area and that only Corvettes had a higher rate of theft.

After receiving the report on the front plate, Elle tried the driver's door on the Porsche. It was unlocked. Because there was no public identification number visible from the outside of the car, Elle wanted to establish the identity by opening the driver's door where he knew a Federal Standard sticker and identification number should be. He opened the door and found the sticker. He had to use a flashlight to read the number.

Elle and Holmes then returned to the patrol car and drove about a block and a half while Elle asked the dispatcher to check the identification number. The dispatcher reported that neither defendant nor Huycke was listed as an owner and that a vehicle with that number was reported as stolen earlier in the year in Corvallis.

The officers returned to the residence less than a minute after the second visit. Elle noticed that some changes had occurred. There were several cats at the residence. On the first visit, the cats were in the garage. On the second visit, they were out of the garage. On the third visit, the cats were back in the garage and the garage was locked. Elle also noticed that the lighting inside the residence had changed. A light that had been on in the rear of the house during the second visit was out when they returned. Elle believed the defendant was there.

Elle went to the door, knocked again, announced who he was and indicated to defendant that he wanted to talk to him. When he got no answer he went around the side of the residence and at that point was unsure if the lighting inside changed again. Elle returned to the front and asked Holmes to go to the patrol car and ask the dispatcher to call defendant. While Holmes was gone, Elle heard a rustling noise inside the house. He tried the door and found that it was unlocked. He opened the door enough to see into the living room area and called loudly to defendant, announcing who he was and who he represented. There was no response, but Elle believed he may have heard some more rustling noise from the rear of the house.

As Elle was standing at the door, he could see inside to the living room area. He observed at that point what appeared to him as a bong or hash pipe and some stems of marijuana on a corner table about fifteen to twenty feet away. The stems were crumpled in an ash tray. Elle had experience in undercover narcotics investigation and training in identification of narcotics, including marijuana. He had made approximately 200 arrests for offenses involving marijuana and marijuana paraphernalia. He believed he could identify marijuana in its cut state.

Elle stepped inside the house and called for defendant again. At that point he heard some noise to the rear. He started in that direction and, as he went past the corner table, was able to clearly see the paraphernalia and vegetable matter. He went on to an open bedroom and located defendant standing just inside the doorway to the clothes closet. Defendant was fully clothed.

Elle later again advised defendant of his *Miranda* rights and obtained a consent to search the residence from both defendant and Huycke. Defendant stipulated at the hearing that the advice of rights was properly given.

Elle testified at the hearing that they returned to the residence to talk to defendant about the vehicle. He did not intend to arrest defendant without speaking to him first. He recalled that there was one door to the residence and there were windows. When advised that the police report indicated there were two doors, he stated that without reviewing it, he was not sure. Elle also was not sure if the windows opened. After he observed the marijuana, Elle continued his investigation to find defendant and to search for additional evidence. Elle did not first apply for a search warrant because he believed that if they left, there was a good chance that the car would disappear. He testified that in his experience, it took between four and ten hours to get a warrant. Because of the time of day, he probably would not have been able to make radio contact with the district attorney's office. According to Holmes, the city police and state police would have provided assistance upon request if they had available deputies.

Defendant testified at the hearing that Miss Johnson did live near the high school, that the name was in the telephone book and that he had been at the residence before. According to defendant, Elle told him it would take between two and four hours to get a warrant. Defendant had done an experiment to see if anyone could observe anything resembling stems on the corner table from where Elle had been standing. Defendant was not capable of observing anything but a bong from that distance and in the same lighting. According to defendant, no stems had been seized. According to Elle the seized stems were not in the courtroom at the time of the hearing but rather were in the sheriff's property locker.

Defendant's motion to suppress alleged that there was no lawful warrant, there was no probable cause and there was no lawful consent to search and seizure, that the search and seizure were not incident to a lawful arrest and were not otherwise lawful. On February 10, 1978, the Yamhill County Circuit Court heard arguments of counsel. On May 1, 1978, the

circuit court entered an amended order denying defendant's motion to suppress evidence obtained from the vehicle but granting the motion to suppress evidence and statements obtained as a consequence of opening the door and entering the residence. The state appeals from that part of the court's amended order suppressing the evidence and statements obtained as a result of opening the door and entering the residence. Defendant does not cross appeal.

The trial court specifically ruled,

> "All evidence seized and statements made after the uninvited entry into the residence at 665 East 26th, McMinnville was unlawfully obtained *as there were no exigent circumstances to justify the entry even though there was probable cause.*
>
> "* * * [D]efendant's motion, to the extent it applies to evidence and statements obtained subsequent to the entry into the residence, is granted." (Emphasis added.)

We take it from the language of the court's order that, although there existed discrepancies in the testimony, the court's conclusions were based upon the uncontested facts concerning the events which preceded entry into the house. With those as the historical facts, we are called upon to review the correctness of the trial court's application of the constitutional principal involved. *See State v. Warner,* 284 Or 147, 585 P2d 681 (1978). Assuming, without deciding, that an officer having probable cause to arrest must nonetheless generally delay doing so until he has obtained a warrant,[1] we hold that the officer here was justified by exigent circumstances in entering the residence without a warrant to arrest defendant.

We agree with the trial court that the officers had probable cause to arrest the defendant.[2] The presence

---

[1] The contrary seems to be suggested by *United States v. Watson,* 423 US 411, 96 S Ct 820, 46 L Ed 2d 598 (1976).

[2] The fact that the officer gave another reason for his entry into the premises does not in any way detract from his authority. The officer's state of mind is immaterial, so long as he has probable cause to do what he does. *State v. Carter/Dawson,* 34 Or App 21, 19, 578 P2d 790 (1978); *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969).

of a stolen Porsche automobile at the defendant's residence, when coupled with the fact that defendant had been seen on a previous occasion driving the Porsche and the further fact that defendant was apparently hiding inside the house and refusing to answer in response to the officer's attempts to contact him, would justify a reasonable person to believe that the defendant had either stolen the automobile or was possessing it with knowledge that it was stolen, and hoped to escape from the officers.

As to exigent circumstances, this case is governed by *State v. Girard,* 276 Or 511, 555 P2d 445 (1976). In *Girard,* as in this case, officers had reason to believe that a defendant inside knew that the officers were outside and were likely to attempt to arrest him. While the evidence is less than clear about the number of doors to the residence, it is clear that there was at least one door and a number of windows. An officer is not required to stand around and wait for a defendant to choose which of several potential exits defendant may wish to use to "make a break." Exigent circumstances arise when the possibility of "making a break" exists. It existed here. As the Supreme Court stated in *Girard,*

> "* * * defendant argued that the two officers could have 'surrounded' the house to avoid escape while they waited for reinforcements. That involves a large measure of speculation, depending upon a variety of factors relating to the feasibility of 'surrounding' the house or otherwise preventing escape, including the size of the house, the number of exits, the proximity of the house to cover for a person bent on escape, visibility, etc. In the exigencies of the moment, the officers could not reasonably be expected to put fine weights on the scale in weighing the chances of securing the house or losing their quarry." *Id.,* 276 Or at 515.

The order of the trial court suppressing physical evidence and statements obtained after the officers entry into the defendant's residence is reversed.