Argued and submitted July 29, 1987, reversed and remanded October 12, reconsideration denied December 9, 1988, petition for review denied January 4, 1989 (307 Or 303).

## STATE OF OREGON,
*Appellant,*

*v.*

## RANDY RAY WOLFE,
*Respondent.*

(86-0372, 86-0373; CA A40549 (Control), A40607)
(Cases Consolidated)

763 P2d 154

Terry Ann Leggert, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Ingrid MacFarlane, Salem, argued the cause for respondent. On the brief were Gary D. Babcock, Public Defender, and Stephen J. Williams, Deputy Public Defender, Salem.

Before Richardson, Presiding Judge, and Joseph, Chief Judge, and Newman, J.

NEWMAN, J.

Joseph, C. J., dissenting.

## NEWMAN, J.

In this prosecution under two two-count informations, each charging burglary I and theft I, ORS 164.225; ORS 164.055, the state appeals an order suppressing evidence that it obtained as a result of a stop. ORS 138.060(3). We reverse.

Officer Truedson testified at the suppression hearing that he was working day-shift patrol when, at approximately 11:00 a.m., he received a report from another officer that a neighborhood watch person and some city workers had seen two white men in a red sports car, license plate number CME 573, drive through Truedson's patrol area, stop at houses with "for sale" signs posted in the yards and go up to the houses. At the time, Truedson was aware that, during the previous three months, there had been burglaries of houses for sale in the area. He had personally investigated one burglary, and another officer had investigated two others. In addition, he knew of other similar burglaries in the neighborhood. Truedson testified that the police referred to the crimes as "lock-box" burglaries, because the burglars would use a master key to open the realtor's lock-box found on the handle of the door, remove the house key from the lock-box, open the front door and then replace the house key in the lock-box. The burglars took only small items which they could easily conceal. The burglaries generally occurred during the day when people were away at work, and they were done quickly.

When Truedson received the report from the officer, he thought that there might be a connection between the reported activity and the lock-box burglaries. As he was leaving the police station to investigate, two city workers drove into the station, flagged him down and told him that they had last seen the red sports car parked at a specific address on Dakota Drive in the neighborhood. Truedson testified that he also had information before he stopped defendant and his companion that the two men had been observed going up to that residence and had been out of sight for a short period of time. The neighborhood watch person, who had made the first report to the police, also stopped Truedson and told him where he had last seen the car.

Truedson located the car in approximately five minutes. It was traveling along a street in the residential

neighborhood. He followed it for a short distance and noticed that a rear brake light was out. When he put on his overhead lights, the car pulled over and stopped. Truedson questioned defendant, who was driving, and his companion for approximately 27 minutes about their identity and their activities in the neighborhood. He did not question them about the defective brake light or even mention it. Defendant gave Truedson his driver's license and told him that he was looking for a house to rent, because he had recently gotten a job in the area. Defendant's companion had no identification, but he told Truedson his driver's license number and date of birth. After confirming the men's identifications, Truedson let them leave. He did not cite or arrest them.

Subsequently, the police used the information that they had obtained from that detention to obtain a search warrant for defendant's person, residence and car and for his companion's person and residence. After the searches, the state filed the informations against defendant, one of which charges burglary and theft at the residence on Dakota Drive. Defendant moved to suppress "the observation of the officers made after the stop, the identity of the individuals contacted at the time of the stop, any statements made by those individuals, all evidence observed or seized under any search and/ or arrest warrant obtained by law enforcement officers in which the affidavit in support of such warrant or warrants contained information obtained pursuant to the unlawful stop."

The court held that the stop was illegal. It first ruled that, under the circumstances, the equipment violation did not support the stop.[1] The state does not argue that the equipment violation supports the stop. The court also held that the stop was not supported by reasonable suspicion that defendant had committed a crime, ORS 131.615, a ruling that the state vigorously contests. The court reasoned that the youth and long hair of defendant and his companion, and the age and appearance of their car, did not make their presence in the neighborhood suspicious enough to justify the stop. Other-

---

[1] Truedson testified that he did not intend to issue a traffic citation for the defective brake light, and he did not even mention it to defendant or his companion.

wise, the judge stated, the police could stop him "every time I drove through somebody's neighborhood leading a steelhead [*sic*] just because I drove an old, dirty pickup and hadn't shaved for a few days." The court suppressed all evidence obtained as a result of the stop and the resulting search warrant.[2]

A police officer may stop a person if he has reasonable suspicion that, under the totality of the circumstances, the person has committed a crime. ORS 131.615. The test is objective and requires less than probable cause. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977). Truedson testified that (1) the men appeared to be in their twenties and too young to buy a house in an upper middle class neighborhood; (2) the sports car, a 1968 model, looked that old and was not a typical realtor's car (which Truedson thought would be one with room for people in the front and back seats); and (3) the men did not look like realtors because of their dress and hair length. We agree with the trial court that the presence in an upper middle class residential neighborhood of long-haired young men driving an older sports car does not provide an objective basis for a reasonable suspicion that they had committed a crime. *See State v. Chambers,* 69 Or App 681, 686, 687 P2d 805 (1984).

Truedson's testimony, however, shows that his suspicion was not only based on appearances—that defendant and his companion looked "out of place" in the neighborhood —but also on his knowledge of previous burglaries in the area and on the information which he had received regarding their conduct. He knew that they had stopped and gotten out of their car only at houses for sale and that they had disappeared for a short period of time at at least one residence for sale. That conduct was consistent with the pattern in the "lockbox" burglaries with which he was personally familiar. He also knew that there were few people out and about in the neighborhood in the late morning, making it less likely that defendant and his companion would run into realtors or

---

[2] The court ruled that, although the affidavit in support of the search warrant contained information obtained independently of the stop, it was "shot through" with information obtained as a result of the stop. The state here does not argue that the search was valid if the stop was not. *See Pooler v. MVD,* 306 Or 46, 755 P2d 701 (1988).

homeowners. We conclude that Truedson had a reasonable suspicion that defendant and his companion had committed a crime.[3]

██,██. We also must determine whether the stop extended over more than a reasonable time. ORS 131.615(2).[4] An officer may detain an individual only for the time reasonably necessary to accomplish the purpose of the stop. Truedson testified that he detained defendant and his companion for approximately 27 minutes in order to question them about their activities in the neighborhood, check their identity and fill out a field contact report documenting the stop. He testified that, normally, if an individual has identification, he would spend ten minutes per individual to verify identity, check his record and fill out a field identification card. In this case, it took him longer, however, because defendant's companion did not have any identification. We hold that the stop did not extend for longer than reasonably necessary to accomplish the purposes of the stop. *See State v. Tucker,* 286 Or 485, 498, 595 P2d 1364 (1979).

Reversed and remanded.

**JOSEPH, C. J.,** dissenting.

It is impossible for me to believe that the majority understands what it is saying. The trial court said that the stop of defendant and his companion in an automobile was illegal.[1] The trial court also held that the police had no objective, articulable basis for a reasonable suspicion that defendant or his companion had committed a crime. Thus, under ORS 131.615, there was no basis for a stop.

The majority does not seem to have noticed (or just cannot bring itself to acknowledge) one critical fact: *No crime*

---

[3] Contrary to the dissent's assertion, the stop was not a pretextual traffic stop. Although Truedson stopped defendant after he saw the equipment violation, which the state concedes does not support the stop, that does not invalidate it, because Truedson also had a reasonable suspicion at the time of the stop that defendant had committed a crime.

[4] ORS 131.615(2) provides:

"The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time."

[1] The state concedes that it cannot sustain the stop on the basis of the bad tail light pretext.'

*for which defendant and his companion could have been sus-*
*pects had been reported in that neighborhood on that day at any*
*relevant time.* That their conduct was consistent with crimes
that might have been committed on a different day cannot be
an adequate basis for a suspicion that defendant and his com-
panion had committed a specific crime or crimes with which
they might have been charged as a direct result of the police
stopping and investigating them.[2] The conclusion of the
majority "that Truedson had a reasonable suspicion that
defendant and his companion had committed a crime," 93 Or
App at 405-06, lacks any foundation whatsoever in this record.
That is, there was no objective, articulable basis for forming a
belief that could be reasonable.

That is sufficient to sustain the trial court's suppres-
sion order. However, the majority insists on compounding *its*
error by holding that it was all right for the officer to detain
defendant and his companion for approximately 27 minutes
and question them about their activities in the neighborhood,
check their identity and fill out some sort of a report.[3] Again,
the majority seems wholly unaware of the fact that there was
no crime being investigated.

Moreover, the majority adds a new aspect to the ever
more complicated case law under ORS 131.615. That is,
because defendant's companion had no identification, it was
all right to detain defendant, who *did* have a driver's license
and who *did* furnish Truedson his date of birth, *both of which*
*Truedson was able readily and quickly to confirm.* Given that
Truedson started the whole process with a pretext stop (not
based on any claim of reasonable suspicion that a crime had
been committed and that defendant and his companion had
committed it), it is mind-boggling that the majority would
uphold what happened here.

If that is not enough, the majority's citation of *State*
*v. Tucker,* 286 Or 485, 595 P2d 1364 (1979), ought certainly to
alert the reader (and the Supreme Court on review). In the

---

[2] I understand the majority to concede that the personal characteristics of defen-
dant and his companion and the appearance of their car do not contribute to reason-
able suspicion.

[3] It seems strange that, in 27 minutes, the police could not have arranged to check
the Dakota Drive house to determine whether it had been burglarized.

first place, *Tucker appears* to be based on the Fourth Amendment. It is certainly not based very much, if at all, on ORS 131.615. In the second place, the main foundation of *Tucker* is that the original contact between the defendant and the police was a *legal* stop. In the third place (and related to the second place), the Supreme Court was at pains in *Tucker* to explain some of its language in *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977), and to point out that, once it is accepted that the initial contact between the police and a citizen was based on a pretext, the game is up. 286 Or at 493.

It is also hardly legitimate to cite *State v. Tucker, supra,* and to ignore either our opinion in *State v. Carter/ Dawson,* 34 Or App 21, 578 P2d 790 (1978), or the Supreme Court's opinion in the same case on review. 287 Or 479, 600 P2d 873. Although our decision in that case is probably only an historical curiosity at best, *see Younger v. City of Portland,* 305 Or 346, 350 n 5, 752 P2d 262 (1988), the Supreme Court accepted (or, at least, did not reject) the standard which we applied:

> "Traffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop." 34 Or App at 32.

Even if our opinion in *Carter/Dawson* is of doubtful authority, the principle remains valid: In the absence of an articulable basis for reasonable suspicion that the driver of an automobile has committed *a* crime, and if there is no other basis for stopping his movement, such as a violation of the traffic laws, the police cannot make use of information garnered during a stop. It is astonishing that the majority thinks the law is otherwise. *See Pooler v. MVD,* 306 Or 47, 755 P2d 701 (1988).